IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 8, 2020 Session

**STATE OF TENNESSEE v. WILLIAM EUGENE MOON**

**Appeal from the Circuit Court for Coffee County
No. 44,905F  L. Craig Johnson, Judge**

_____

**No. M2019-01865-CCA-R3-CD**

_____

A Coffee County jury convicted William Eugene Moon, Defendant, of attempted second degree murder and unlawful employment of a firearm during the commission of or attempt to commit a dangerous felony.  On appeal, Defendant argues that the trial court erred by allowing the improper impeachment of a defense witness, that there was insufficient evidence to support his convictions, and that he was denied the right to a speedy trial.  After a thorough review of the record and applicable case law, the judgments of the circuit court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Andrew Justice, Murfreesboro, Tennessee, for the appellant, William Eugene Moon.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Craig Northcott, District Attorney General; and Jason Ponder, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural History**

*Pretrial Procedure and Hearings*

On April 10, 2018, the Coffee County Grand Jury indicted Defendant for attempted first degree murder in count one, resisting arrest in count two, aggravated assault in count three, unlawful possession of a firearm with intent to commit or attempt to commit a dangerous felony in count four, and unlawful employment of a firearm during the

commission of or attempt to commit a dangerous felony in count five. Defendant was arraigned on April 17, 2018. The case was reset for May 9, 2018, to allow Defendant to obtain discovery. According to Defendant, on May 9th, he asked to set a trial date, but, because the prosecutor handling his case was not present, the case was reset to May 23, 2018. On May 23, 2018, the trial court set the case for trial on November 28, 2018.

On November 6, 2018, the State moved for a continuance of Defendant's trial due to a scheduling conflict with a multi-day rape trial set to begin November 29, 2018. The motion claimed that the other trial involved an alleged rape that occurred on September 7, 2015, and the case had been set by a different assistant district attorney. The motion also claimed that the rape case was "ready for trial," that the State did "not anticipate any resolution of that case," and that the sixteen-year-old victim had "mentally and emotionally prepared herself for trial . . . and very much wants and needs that matter to come to a conclusion."

By agreement, the motion to continue was heard on November 7, 2018, one day after the motion was filed. The State argued that Defendant's case "was less than a year old, so the speedy trial rights ha[d] not yet been implicated under Tennessee state law, whereas the other matter ha[d] been pending for three years." Defense counsel opposed the continuance, arguing that Defendant had been incarcerated since January 2018 and that defense counsel had filed a speedy trial demand shortly thereafter.[1]

The trial court weighed the circumstances of the two cases set for the last week in November 2018, and concluded that the age of the cases was paramount and granted the motion to continue. Defense counsel estimated that Defendant's trial was "likely to take either two or three days, and three is . . . probably the most likely[.]" After discussing possible trial dates on the record, the transcript of the motion hearing states: "(A recess was taken, during which the trial date of February 1, 2019, was scheduled by the [c]ourt and counsel in chambers[.])"

On January 16, 2019, Defendant filed a motion to dismiss for violation of the right to a speedy trial. On January 23, 2019, the trial court heard testimony and arguments on Defendant's motion to dismiss. Defendant testified that, after the date of the offenses, he was transported to a hospital in Huntsville, Alabama, where he remained for three weeks. Defendant recalled that, after spending "a couple weeks" in the "Huntsville Jail," he was returned to Coffee County where he was "served with a warrant." He said that being incarcerated in the Coffee County Jail was "pretty bad" and that he was "locked up" for

---

[1] Defendant filed a "Demand for Speedy Trial" in the General Sessions Court for Coffee County on March 7, 2018.

twenty-two hours per day. He stated that he never got to go outside and see the sunlight. Defendant explained that he had no prior felony convictions.

Defendant explained that, on the night of the offenses, he was shot five times and had several medical issues. He stated that the medical treatment at Coffee County Jail was "not very good." Defendant said that he had to return to "medical" to receive additional stitches. Defendant testified that he worried about the charges in this case "every day" and that facing the prospect of years in prison made him "depressed." Defense counsel argued that Defendant was prejudiced by the delay because Mr. Donald Woods[2] agreed to testify at trial that Defendant did not have a gun during the encounter, but, during the delay, Mr. Donald Woods left the state and was missing.[3]

Following argument, a discussion took place involving the length of Defendant's trial. Defense counsel stated that he "was under the impression [the trial] would start on February 1st and then continue to the 4th[.]" The trial court noted that February 1st was a Friday and that he had a motion docket set on that day. The court asked the parties to look at their calendar, and after conferring with counsel, reset Defendant's trial for the first available date: February 11, 2019.

On February 7, 2019, the trial court issued a written order denying Defendant's Motion to Dismiss. It explained:

> When this Motion [to Dismiss] was argued, it had only been less than nine (9) months since [D]efendant was arraigned in this matter. The initial date of November [28, 2018,] for the first trial was set in the presence of both parties. In fact, the only trial continuance in the case was from the original trial date in November, which was only approximately two-and-one-half (2.5) months ago. The short two (2)-month delay for the resetting of a new trial date was necessitated by having to try another case that had been on the docket longer and dealt with just as sensitive facts. Being an attempted murder trial, this case is complicated, and therefore, would necessitate some months' preparation. However, [D]efendant argues that this case is comparable to a normal "street crime." This [c]ourt respectfully disagrees. Several months of preparation, a lengthy witness list, and a projection of three (3) days to try it show otherwise.

> As to the assertion of the right, [D]efendant did file a Motion for Speedy Trial in the General Sessions Court. He also asked for a first-

---

[2] Because two witnesses share the same last name, we will refer to each of them by their full name.
[3] Mr. Donald Woods was obviously located because he testified as a witness for Defendant at trial.

- 3 -

available trial date in May of 2018, which precipitated the early trial settings. As far as prejudice to the accused, again, the [c]ourt cannot ascertain when [D]efendant's witness went missing or the real efforts made in locating him. However, from reading the defense counsel's affidavit and the statement given by the witness at the time of the incident, it appears his testimony would be neutral at best for the defense. He stated at the time of the incident that he saw [D]efendant start to fumble around with the policeman and then heard shots fired. Defense counsel's affidavit basically states that the witness did not see [Defendant] try to shoot the officer. It is also important to note that [D]efendant argues that [D]efendant's bond is high, but the defense has not filed a motion to reduce bond in the Circuit case, and it appears his pre[]trial incarceration has been a relatively normal one, considering the circumstances.

*Trial*

State's Proof

On February 11, 2019, the State dismissed counts two, three, and four of the indictment and proceeded to trial on count one, attempted second degree murder, and count five, unlawful employment of a firearm during the commission of or attempt to commit a dangerous felony.

Officer Michael Wilder testified that, in December 2017, he was employed with the Tullahoma Police Department ("TPD"). During his patrol around noon on December 17, 2017, he saw a black SUV outside some apartments where he had once executed a search warrant for drug trafficking. As he passed by the SUV, he noted that there were four individuals inside and that the windows were "spray painted." Officer Wilder recalled that he parked on a side alley and observed the SUV. He saw that the occupants of the SUV "kept getting in and out of the vehicle and walking over to the trailer park on the opposite side of the road." Officer Wilder decided to drive through the trailer park to try "to figure out what [wa]s going on." Once Officer Wilder was inside the trailer park, "one person lowered his head and ran through the crowd and ran up into the trailer." Officer Wilder spoke with the trailer park manager, Mr. Larry Woods, who told Officer Wilder that the man who just ran through the crowd was Defendant. Officer Wilder knew that there were "aggravated assault warrants" against Defendant and asked Mr. Larry Woods to ask Defendant to come out and speak with him. Mr. Larry Woods yelled for Defendant to come outside. When Defendant came outside, Officer Wilder asked Defendant his name. Defendant first lied about his identity before admitting his real name. Officer Wilder asked Defendant to come with him and Defendant stepped down from the porch. Officer Wilder recalled that Defendant began to "get kind of fidgety" and "nervous" and that his "breathing

start[ed] to pick up." Officer Wilder testified that Defendant's reactions were "signs [that] evasion [wa]s about to happen or violence, possible violence[.]" During the subsequent conversation, Officer Wilder noticed a plastic bag in Defendant's mouth that Officer Wilder believed contained methamphetamine. Officer Wilder placed his "right hand up against the side of [Defendant's] throat" and told Defendant to "spit it out." Officer Wilder continued:

> I asked him repeatedly to spit it out. He finally [did]. . . . I push[ed] him back down on the steps with my knee and like my side. [He] [s]tart[ed] to move with his left side as well. I grab[bed] that, trying to keep him pinned down so he wouldn't get up. . . . At that point, he [wa]s getting agitated and saying, "F---, no. This ain't happening. F---, no." . . . . [I] [r]eached back over and was able to grab his hand again because he had it on the rail at that time, trying to pick his body up. At this point, I [was] just trying to keep him pinned. . . . As I looked to my right, I s[aw] the other Tullahoma [police] unit slide past the driveway, and . . . I c[ould] hear him pulling into the driveway.

> At this point, I'm still just trying to watch [Defendant] because I haven't patted him down. I mean, he was wearing a black T shirt and black shorts. I c[ould] hear the door shut by the other police officer, and at this point, I just glance[d] over to my right, and I sa[id], "Hurry up. Hurry up," and as soon as I did that, I could feel the lower right side of [Defendant], his right hand lower down, and as I c[a]me back with my eyes, he pulled a gun from somewhere. It was directly at my ribs and my stomach. At this point, I immediately tensed up. I was like, "Is it going to hit my vest? Is it going to hit my hip or anything like that?" [S]o I grabbed a hold of the gun and started pushing it away from my body. The first kind of natural instinct [wa]s to try to disengage it. It's a semiautomatic weapon. If you can disengage it, sometimes you can prevent it from firing.

Officer Wilder explained that, when he "disengaged the gun," he "push[ed] the firing pin back from where it can strike the primer of the bullet." He recalled, "[O]nce I got [the gun] away from me, I was losing grip on it, and I kept trying to keep it pushed away from me, but [Defendant] had more on the handle of the gun, and he kept torqu[e]ing it, and it got closer and closer." Officer Wilder thought, "Well, if [Defendant] gets on top of me, he's got me." He explained that, with Defendant's gun "coming back at [him]," he "felt like [Defendant] was really trying to kill [him]." Officer Wilder explained, "The gun [wa]s still getting closer. I c[ould]n't stop it. He [had] more leverage on it, and I [] just got the end of the barrel." He said that, when he was struggling with Defendant for the gun, he could feel Defendant's "right hand gripping the firearm." Officer Wilder testified

- 5 -

that he could not hear "clicking" and that he was "not really trying to look down and see if the trigger [wa]s being pulled" but that he "could feel the gun pulsing" and "shaking" in Defendant's hand. Officer Wilder explained, "I don't know if [Defendant] was trying to pull the trigger or not, but I wasn't going to look down there to see." Officer Wilder stated that his "last resort" was to push Defendant off and "start firing as soon as [he] could." He said, "At this point, there [was] no other choice. I knew I had to shoot or be shot. . . . I fired until basically [Defendant's] head rolled backwards slightly, and I could see his eyes go up, and he rolled off of the steps."

Officer Wilder noticed that Defendant attempted "to raise[] up" and that the gun had fallen by the trailer steps where Defendant "could have very easily gotten the gun again." Officer Wilder testified that Mr. Larry Woods was nearby and observed the altercation between Defendant and Officer Wilder. Other officers approached the scene and helped secure the area. Detective William Pyrdom[4] secured Defendant's gun and told Officer Wilder that it was a nine-millimeter. Officer Wilder began administering medical aid while an ambulance was en route. Defendant kept saying, "Just let me f-ing die. Just let me f-ing die." Then Defendant said to Officer Wilder, "I wasn't really going to shoot you." Officer Wilder replied, "Well, you just keep telling yourself that." When EMS arrived, Officer Wilder stepped away from Defendant and "felt sick to [his] stomach."

While reviewing the dashcam video before the jury, Officer Wilder pointed out that a .22 round fell from Defendant's pocket. Officer Wilder also observed a nine-millimeter round on the ground.

Officer Wilder said that, after the incident, agents from the Tennessee Bureau of Investigation ("TBI") interviewed him and took pictures of the scene.

Officer Wilder testified that, based upon his training and experience, there was no doubt in his mind that Defendant was attempting to use deadly force against him. He explained, "There's no doubt in my mind. I mean, you pull a firearm on a police officer that's trying to scuffle with you, I mean, there is no other intent that I can see."

On cross-examination, Officer Wilder agreed that, after he shot Defendant, Defendant repeatedly asked Officer Wilder why he shot Defendant. Officer Wilder agreed that, at the scene, Defendant denied pulling a gun on Officer Wilder. Officer Wilder denied any prior incident in which he threatened to "get [Defendant and his brother] off the streets" by shooting them. Officer Wilder denied that he saw a gun in Defendant's pants and "got

---

[4] Detective Pyrdom was a patrolman at the time of the offense. For the sake of clarity, however, we will refer to him by his title at the time of trial.

scared." Officer Wilder explained that a police officer who shot a "non-threatening civilian" would likely face criminal charges, would lose his job, and may face a lawsuit.

Officer Wilder agreed that he never told Defendant that he was under arrest. Officer Wilder explained that, when "someone pulls a gun on you, I mean, you don't really have a lot of time to say, 'You are under arrest.'" Officer Wilder denied that he "grab[bed] [Defendant] by the throat" but explained that he tried to "inflict discomfort" on Defendant's neck to get Defendant to spit out the methamphetamine. Officer Wilder agreed that, when Defendant began to "tussle" with him, Officer Wilder started to get "more nervous." He recalled that, at the preliminary hearing, he testified that a bullet may have ejected from Defendant's gun. Officer Wilder said that he did not know at what point he thought to turn on his dashcam recorder. Officer Wilder agreed that, at the preliminary hearing, he testified that Detective Pyrdom was "fifteen or twenty" feet away at the time of the shooting.

On redirect examination, Officer Wilder stated that he had arrested hundreds of offenders in his career but had never used deadly force until this case.

Detective Pyrdom testified that he received a call from Officer Wilder for back up, so he proceeded to East Moore Street. Officer Wilder called again, and Detective Pyrdom noted that he "could hear some stress in [Officer Wilder's] voice," so Detective Pyrdom sped up. Detective Pyrdom parked and could see the "scuffle" next to a trailer. Detective Pyrdom ran towards the trailer, but his view of the scene was partially obstructed by the door to a truck. He stated that he "could see [Officer Wilder] fighting with somebody coming down the steps" but that he could not see Defendant's or Officer Wilder's hands. Detective Pyrdom heard shots fired and saw Defendant fall. He explained,

[Defendant was] on his back at the foot of the steps. When the shots were fired, I immediately drew my weapon. At that point, I didn't know what [was] going on, and [Officer] Wilder [wa]s hollering, "Get that gun. Get that gun." When he hollered that, I picked up the weapon that was at the foot of the steps and secured it behind my belt.

Detective Pyrdom stated that the firearm was not under Defendant because he could clearly see it on the ground next to him. Detective Pyrdom recalled that Officer Wilder rendered medical aid to Defendant and that Detective Pyrdom and TPD Officer Tim Brandon secured the scene.

Detective Pyrdom stated that, at the time of the offense, Officer Wilder was his superior officer and that Officer Wilder was "competent and good at his job." He said, "I've never seen him lose control or even act like he was going to lose control."

On cross-examination, Detective Pyrdom testified that, as he approached the scene, he did not see a weapon in Defendant's hand. Detective Pyrdom did not draw his weapon as he approached because he believed it was "just a fight." He agreed that he never saw a gun "hit the ground" after Defendant was shot. Detective Pyrdom testified that Officer Wilder shot Defendant from very close range. He stated that, as Defendant fell, he did not notice whether Defendant had a weapon in his hand and that he did not hear anything hit the ground. Detective Pyrdom recalled that Officer Wilder told Defendant to "stop resisting" and "stop fighting" but that he did not hear Officer Wilder tell Defendant to drop a weapon. Detective Pyrdom agreed that, on the audio recording from the dashcam, one of the officers told the TBI investigators that the gun was lying under Defendant when they reached the scene, but Detective Pyrdom could not tell who made the statement. Detective Pyrdom agreed that, when he approached Defendant lying on the ground, Defendant was still "rolling around" and that, theoretically, a weapon that had been in Defendant's waistband may have "come loose." Detective Pyrdom agreed that Officer Wilder reported that Defendant's weapon was a ".22" and that a ".22 shell" was ejected from the weapon.

On redirect examination, Detective Pyrdom testified that nothing that Officer Wilder did on the day of the offense was inappropriate and that he had no reason to disbelieve Officer Wilder's account. He stated that, while it was possible that a weapon could have "come loose" from Defendant's waistband while he was on the ground, he did not believe that was what happened based on how quickly he approached the scene.

TPD Investigator Harry Conway testified that he responded to an officer-involved shooting on December 17, 2017. When he arrived, Lieutenant Jason Ferrell was already present and processing the scene. Investigator Conway took photographs and turned them over to the district attorney general. He took possession of the gun that Detective Pyrdom retrieved from the scene. Investigator Conway and Lieutenant Ferrell inventoried the weapon and observed a "live round inside the chamber" as well as twelve rounds inside the magazine. Investigator Conway explained that the gun was a nine-millimeter Taurus Millennium G2 and that the weapon would not be able to fire if the "slide" was back. He stated that he transferred the weapon to the TBI.

Investigator Conway testified that he knew Officer Wilder very well for several years. He stated that he never had any reason to be concerned about Officer Wilder and that he had never known Officer Wilder to be dishonest.

On cross-examination, Investigator Conway demonstrated pulling the trigger when the slide was back and agreed that pulling the trigger made a sound. Investigator Conway agreed that, when an officer served a warrant, he should "notify that person that [he was] placing them under arrest." Investigator Conway explained that, if a person was not compliant with an officer's request to spit out drugs, it would be a "proper restraint" for an

officer "to apply pressure to the throat area maybe to prevent the swallowing of drugs[.]" Investigator Conway stated that he "couldn't correlate a .22 round" being ejected from the weapon he obtained from Detective Pyrdom.

TBI Special Agent Elizabeth Williams testified that she, Agent Dan Friel, Agent Darren Shockey, and Agent Hunter Locke all investigated the December 17, 2017 officer-involved shooting. When Agent Williams arrived at the scene, she spoke with members of the TPD, did a video walk-through of the scene, and took photographs. Agent Williams interviewed three witnesses: Mr. Donald Woods, Mr. Larry Woods, and Mr. James Beck. She stated that the trailer park was "a very hostile environment," so she tried to give orders for bystanders to return to their homes "in the most friendly way" she could.

On cross-examination, Agent Williams testified that other TBI agents interviewed Officer Wilder and Detective Pyrdom. She agreed that there was "stuff" on the nine-millimeter shell casing that was "potentially rust." Agent Williams stated that there was a "small" amount of drugs in the baggie found at the scene. She said that, a few days after the shooting while Defendant was hospitalized, Defendant was willing to speak with her and cooperate but that she decided he was too heavily medicated at the time.

On redirect examination, Agent Williams testified that Defendant's attorney[5] told her that Defendant did not want to speak with her.

Defense Proof

Mr. Steve Moon[6] testified that he was Defendant's brother and that he met Officer Wilder "a few months" prior to the day of the shooting on two separate occasions. Mr. Steve Moon stated that, in the first encounter with Officer Wilder, Officer Wilder came to his home and removed Defendant's son for "about half an hour" for questioning. Mr. Steve Moon said that, in the second encounter, Officer Wilder came to his home looking for Defendant and Defendant's son because "they had warrants on them," but Mr. Steve Moon did not know where they were. He said that Officer Wilder told him that "[Officer Wilder] would do whatever he had to do to take [Defendant] and his son off the streets, even if [Officer Wilder] had to shoot them."

---

[5] Agent Williams identified this attorney by name, and he was not Defendant's attorney at trial or on appeal.

[6] Because this witness has the same last name as Defendant, we will refer to him using his entire name for the sake of clarity.

On cross-examination, Mr. Steve Moon stated that he never told Defendant about his second conversation with Officer Wilder and that he did not report the conversation to the TPD.

Mr. Larry Woods testified that he knew Defendant for "twelve or thirteen years" and that he was present when Defendant was shot. Mr. Larry Woods stated that, on December 17, 2017, Defendant asked Mr. Larry Woods if Defendant could use his restroom, and Mr. Larry Woods agreed. Mr. Larry Woods explained that Officer Wilder then pulled into the trailer park. Mr. Larry Woods walked over to Officer Wilder's vehicle and asked Officer Wilder if he could help. Mr. Larry Woods heard the name "William Eugene Moon" come over Officer Wilder's car radio. Officer Wilder then asked Mr. Larry Woods if the man who went into the trailer was Defendant, and Mr. Larry Woods said yes. While Officer Wilder was still in his vehicle, he asked Mr. Larry Woods if he could speak to Defendant. Mr. Larry Woods agreed to retrieve Defendant from his residence. Mr. Larry Woods testified that, after he "walked up two stairs" towards his trailer, Defendant exited the front door. Mr. Larry Woods informed Defendant that Officer Wilder wanted to speak with him, and Defendant agreed to speak to Officer Wilder.

Mr. Larry Woods stated that he stepped about three feet away. He said that he did not hear Defendant upset or "cussing" and that he did not see a gun on Defendant. Mr. Larry Woods recalled that Mr. Beck handed Defendant a beer and that Mr. Beck then approached Mr. Larry Woods. He said that he never heard anyone say anything about arresting Defendant. Mr. Larry Woods saw that Officer Wilder "seemed like he had ahold of [Defendant]. . . by his throat or something." He stated that he heard Defendant say, "Why have you got to be like that?" Mr. Larry Woods testified that he did not see Defendant "actively fighting" Officer Wilder. Mr. Larry Woods said that he heard Officer Wilder say, "'Stop, or I'm going to taze you,' and then [Officer Wilder] jumped back and shot [Defendant]." Mr. Larry Woods stated that he never saw a gun in Defendant's hand. He said that, after Officer Wilder shot Defendant five times, Officer Wilder turned the gun on Mr. Larry Woods and told him to put his hands up, but Mr. Larry Woods said that his hands were already up. Mr. Larry Woods feared that Officer Wilder would shoot him and said, "My hands are up. Don't shoot me. What's wrong with you? Call the ambulance, call the ambulance." Mr. Larry Woods testified that he never saw a gun on the ground near Defendant after the shooting. He explained,

> When [Detective Pyrdom] came up, [Officer Wilder] told him, "Get the gun," and [Detective Pyrdom] was looking and looking, "Where is the gun?" He couldn't find the gun. He put his foot under [Defendant] and moved his foot and kicked the gun out, and then I [saw] the gun.

On cross-examination, Mr. Larry Woods read his statement to TBI:

[Defendant] came by, asked to use the restroom. Told him to go ahead, went back to what I was doing. Officer pulled up, asked who it was and told him it was [Defendant]. Told [me] to tell him that he wanted to talk to him. Said yes and was out of viewing. Heard him tell [Defendant] to stop or he was going to taze him, and then gunshot. Could not see from where I was.

Mr. Larry Woods explained that his last statement -- that he "could not see from where [he] was" -- referred to the gun and that he could see the interaction between Defendant and Officer Wilder from his vantage point. Mr. Larry Woods testified that he was facing his trailer but saw the encounter "out [of] the corner of [his] right eye." He said, "I mean, this happened so quick, and every time, it's like that day when I wrote that statement [--] [a]n hour later, it seemed different in my head."

Mr. Larry Woods denied that Defendant was at his trailer to buy methamphetamine. He denied that he sold methamphetamine from his residence. Defense counsel objected to the line of questioning, and the jury was excused.

During a jury-out hearing, trial counsel argued that the State had no good faith basis to ask Mr. Larry Woods about selling methamphetamine to Defendant. The State responded that Defendant had methamphetamine in his mouth when he was shot and that Mr. Larry Woods had been indicted for selling methamphetamine at his residence to a confidential informant three months before the present offense. Defense counsel argued that the question violated Tennessee Rule of Evidence 404(b) and "the Channon Christian Act, which generally prohibits throwing prior bad acts at either a defendant or, in this case, a witness." The prosecutor responded,

Your Honor, it's not about impugning character. It's about establishing that Mr. [Larry] Woods has motivation to not be completely honest with what happened that day, and the fact that he is a drug dealer selling drugs from that location would suggest maybe he is not going to be fully cooperative with the police. It would also go to explain how that meth got in [D]efendant's mouth that day and what they were doing there, and so I think it's relevant, and any potential unfair prejudice is minimal to [D]efendant and certainly is outweighed by the probative value.

Defense counsel responded that Mr. Larry Woods's alleged prior bad acts had not been established by clear and convincing evidence. The trial court overruled the objection and explained,

- 11 -

Given this is a witness and given the fact that meth has already been shown and proven at the scene and given that there has been shown a good faith basis in regards to the question, the [c]ourt finds that any prejudice is not -- any prejudice is outweighed by the probative value to give a complete story of what was going on at the time of the crime. The [c]ourt will not exclude the evidence because it bears on a material issue aside from character.

The trial court then allowed the State to introduce the indictments against Mr. Larry Woods for identification purposes only. The trial court explained to Mr. Larry Woods his Fifth Amendment right against self-incrimination, and Mr. Larry Woods stated that he wanted to speak to an attorney before he answered any further questions. The trial court expressed concern about having Mr. Donald Woods, Mr. Larry Woods's son, testify before he understood his Fifth Amendment right against self-incrimination. The trial court recessed for the day so that the witnesses could consult legal counsel.

The following day, defense counsel renewed his objection to relevance and stated that the defense witnesses' prior bad acts would serve only to "inflame the jury." The trial court again overruled his objection. It stated:

I ruled under rule 404 yesterday that the matter of meth being present was already in front of the jury, so I don't really think the additional question of, was there a meth transaction going on is unfairly prejudicial, and even if it was somewhat prejudicial, the probative value of the question as it gives a complete story of motivations, bias, and other things that involve witnesses and a complete story of the crime, I think it's relevant, so I have repeated most of what I said yesterday.

When the jury returned, Mr. Larry Woods invoked his right against self-incrimination regarding prior alleged drug sales on September 19, 2017, and October 12, 2017. Mr. Larry Woods invoked his Fifth Amendment right when asked if he was indicted for selling methamphetamine, if he spoke to any police officers regarding the indictments, whether he confessed to drug transactions, whether he allowed other individuals to sell methamphetamine from his residence, and whether one such individual was a female. Mr. Larry Woods again denied selling methamphetamine to Defendant on December 17, 2017. He affirmed that Mr. Donald Woods was his son.

On redirect examination, Mr. Larry Woods testified that police searched his home on the night of the shooting and that they did not find any drugs in his home.

Following a *Momon* hearing, Defendant testified that he did not "pull a gun" on Officer Wilder or try to kill him, and he stated that he had never pointed a gun at anyone.

- 12 -

Defendant stated that he did not know that there was a warrant out for his arrest for aggravated assault but learned about it when he was in the hospital in Alabama. He explained that the aggravated assault warrant was ultimately dismissed, but he did not recall why. Defendant stated that his level of memory of the event was "not very good." He said that, on December 17, 2017, he asked Mr. Larry Woods if he could use the bathroom and then went inside Mr. Larry Woods's trailer. He stated that, as he came out of the bathroom, Mr. Larry Woods told him that Officer Wilder wanted to speak with him. Defendant admitted that he had a "nine-millimeter Taurus" gun tucked into his shorts at the time. Defendant stated that he agreed to speak with Officer Wilder. Officer Wilder did not place him under arrest.

Defendant recalled sitting down and asking someone for a drink and that he was handed a beer. He stated that he was "chewing on a baggie" with drug residue in it. Defendant explained that he had used most of the drugs in the baggie on the day before. He said that he was not under the influence when speaking with Officer Wilder and that he felt "normal." Defendant said that, when Officer Wilder noticed that Defendant was chewing on the baggie, Officer Wilder took the beer from Defendant and put his hand around Defendant's throat. He explained that it was not a "gentle hand" on his throat and that it was not just on the sides of his neck. Defendant stated that he did not know what was going on and that Officer Wilder still had not placed him under arrest. Defendant recalled spitting the baggie on the ground and stated that he "took and grabbed [Officer Wilder's] hand" with Defendant's left hand "and had to push to get [Officer Wilder's] hand off [Defendant's] throat." Defendant did not recall whether Officer Wilder ever took hold of Defendant's arms or whether he struggled with Officer Wilder. He stated that he never fought with police in the past and had no reason to fight with Officer Wilder. Defendant testified that he never reached for his gun, which was on his right side.

On cross-examination, Defendant denied that he went to Mr. Larry Woods's home to buy methamphetamine and denied any knowledge that Mr. Larry Woods was a "meth dealer[.]" He denied that the reason he asked for a drink was to swallow the evidence in the baggie. Defendant agreed that he had a concealed gun on his right hip during his encounter with Officer Wilder and that the gun was fully loaded. Defendant denied that he pointed the gun at Officer Wilder but agreed that being shot "messed up [his] memory."

On redirect examination, Defendant agreed that, in the dashcam video, Officer Wilder told other officers that Defendant "pulled a gun" and pointed it at him. Defendant agreed that, on the video, he responded by saying, "No I didn't." Defendant recalled hearing himself on the video asking, "Why did you shoot me?" and stating, "I didn't try to pull the gun" and "I wasn't going to shoot you." Defendant stated that he did not go quietly with Officer Wilder because Officer Wilder started choking him. He said that, if he had it

to do over, he would have raised his hands and told Officer Wilder that he had a gun in his waistband.

Following Defendant's testimony, during a jury-out recess, the trial court said that it could not remember whether he found Mr. Larry Woods's prior bad acts were true by clear and convincing evidence. It explained, "So just for the record, just to make sure that's clear for the record, I find that by clear and convincing evidence, those incidents did happen."

Upon the jury's return, the Defendant recalled Agent Williams. She testified that she interviewed Mr. Larry Woods. She explained,

> In my oral interview with Mr. [Larry] Woods, he stated how he was near a blue ladder approximately [fifteen] feet from this incident, and to me at the time, it sounded like everything that he observed was auditory hearing, and he said at the end of it he never saw a gun.

Mr. Donald Woods testified that Mr. Larry Woods was his father and that he was present at the time of the offense. Mr. Donald Woods stated that Defendant was an acquaintance and that he had no reason to "cover" for Defendant. He explained that Defendant pulled into the driveway, followed by Officer Wilder. Mr. Donald Woods told Mr. Larry Woods that an officer was there, and Mr. Larry Woods walked over to Officer Wilder. He said, "The officer got out and asked my dad if that was [Defendant] that just got out of the car and entered the home, and Dad said, 'Yeah' and the officer asked him, if you don't mind, tell him to come outside and talk[.]" Mr. Donald Woods stated that Mr. Larry Woods "walked up to his doorstep and hollered for [Defendant], 'Hey, there's an officer out here that wants to talk to you.'" Mr. Donald Woods saw Defendant walk up to the door and then the officer said, "[Defendant], if you don't mind coming out here and talking to me, I would like to speak to you[.]" Mr. Donald Woods said that Defendant agreed and that Officer Wilder then said, "'[Defendant], I'm asking. Come out here and speak to me, or I can tell you to come out here and speak to me.'" Mr. Donald Woods explained that Defendant agreed and "stepped through the front door, and the officer stepped all the way up to the stairs, so both of them -- the officer was on second stair from the top, and [Defendant] was on the top stair." Mr. Donald Woods recalled that he observed this encounter from the passenger side of his truck, "so [Mr. Donald Woods] was basically right beside the stairs." Mr. Donald Woods continued,

> [Defendant] didn't step down at the time. He c[a]me out to the top of the step and sat right there, and they started exchanging words, and [Defendant] hollered to [Mr.] Beck, "Jimmy, give me my beer out of the car[.]" [Mr.]

- 14 -

Beck asked the cop [if that] was [] fine. [Mr.] Beck walked around and grabbed the beer. . . .

[W]henever [Mr.] Beck handed [Defendant] the beer, [Defendant] took the top off of his beer, and as he went to take a drink, he threw something in his mouth and didn't get the beer to his mouth, and the cop said, "Don't do it, [Defendant]" and grabbed him by his throat and literally like squeezed him, and the cop stepped down one stair. [Defendant] sat down and spit it out, and that's when [Defendant] said, "You ain't got to be so rough on me, man." I [saw] [Defendant] grab his -- just his hand because both hands -- or the cop's hands was on [Defendant]'s neck. Whenever [Defendant] went to grab [Officer Wilder's] hand, [Defendant's] body got shoved down, . . . and the cop stepped off because he was at the -- probably the third step up, and he stepped off, and that fast, the shots was being fired. I grabbed J.J. that was right beside me, and I hit the ground, and I said that was it. The other cop -- at that time, the other cop was running up to me and J.J. and had his gun drawn at us, which I told him, "You're crazy. All I have is a pocket knife on me," and that's how it went down.

Mr. Donald Woods testified that Defendant never cussed at the officer and that "they w[ere] just talking at the top of the steps." Mr. Donald Woods stated that he never saw a gun in Defendant's hand. He explained,

I didn't see the gun until [Defendant] was shot, and he rolled forward and finished rolling off of the steps, and the gun was right basically, right behind [Defendant] in the little pocket. [Defendant] rolled forward off [the stairs]. I [saw] the gun on the ground. . . . It fell right behind [Defendant] . . . within a foot of him.

Mr. Donald Woods testified that Officer Wilder never told Defendant he was arresting him. He stated that, if Defendant had a gun in his hand, he would have seen it. Mr. Donald Woods stated that it was a matter of one or two seconds between the time Officer Wilder let go of Defendant's neck and the time that Officer Wilder shot Defendant. Mr. Donald Woods stated that he saw Defendant's left hand trying to push Officer Wilder's hands away from his throat but that he did not see where Defendant's right hand was. Mr. Donald Woods agreed that, from his vantage point, Defendant's right hand would have been furthest away from Mr. Donald Woods and that Officer Wilder would have been in between Mr. Donald Woods and Defendant.

On cross-examination, Mr. Donald Woods explained that all the doors of his truck were open because he was cleaning out his truck. He stated that, when the shooting

- 15 -

happened, he was sitting in the driver's seat of his truck, watching through his windshield. Mr. Donald Woods denied that Mr. Larry Woods sold methamphetamine out of his residence. Mr. Donald Woods read his statement: "All I [saw] was . . . [a] cop asking [Defendant] to come outside. Stepped on stairs and started to fumble around with the cop. Shots fired. I hit the ground."

J.J.[7] testified that he was fifteen years old and that Defendant was a "good friend" of his. J.J. denied that he ever consumed alcohol or drugs with Defendant. He said that, on the day of the shooting, Defendant parked his car and went inside a trailer, and then Officer Wilder "pulled up." J.J. stated that Mr. Larry Woods spoke to Officer Wilder and then "went and got [Defendant.]" J.J. said that, when Officer Wilder first arrived, J.J. went inside the trailer to get his phone and that he could see Defendant in the living room. J.J. explained that he saw Defendant in the living room "holstering" the gun "in his pants somewhere."

J.J. stated that Officer Wilder never said anything about arresting Defendant or that there was a warrant for Defendant. He recalled that Officer Wilder threw Defendant's beer on the ground. He said that Officer Wilder told Defendant to "spit it out" and that Officer Wilder "put[] his hands on [Defendant's] face" to try "to get whatever was in [Defendant's] mouth out." He said that "they w[ere] wrestling around, and [Defendant] pushed [Officer Wilder] back, and [Officer Wilder] started shooting." J.J. explained that Defendant pushed Officer Wilder with both of Defendant's hands and that there was not a gun in Defendant's hands. J.J. stated that it was "[p]robably four seconds" between the time Officer Wilder had his hands on Defendant's face and the time Officer Wilder shot Defendant.

J.J. stated that he was in the back seat of the truck during the incident and that he observed it through two open doors. He agreed that, from his vantage point, he would have seen if Defendant had pulled a gun on Officer Wilder.

On cross-examination, J.J. said that he was fourteen years old at the time of the shooting. He said that, when he was in the truck, Mr. Donald Woods was beside him. J.J. said that he never spoke to police about the incident but only spoke to defense counsel. He agreed that, when Defendant put the gun in his waistband, he "concealed" it.

Miranda Barkve testified that she was J.J.'s mother and that she knew Defendant but was not Defendant's friend. Ms. Barkve said that she lived behind Mr. Larry Woods. She said that, on the day of the shooting, she was in her living room and heard a "ruckus" with "somebody hollering or screaming," so she looked outside. She walked down her porch steps and heard Defendant say, "Are you going to taze me?" She said that, within

---

[7] It is this court's custom to use initials for juvenile witnesses.

five seconds of Defendant's statement, she heard gunshots. Ms. Barkve ran towards her son, who was near Mr. Larry Woods's trailer, and found him on the ground. When she rounded the corner of the trailer, the officers told her, "Get on the f***ing ground!" Ms. Barkve admitted that she was rude to the officers and that she "cuss[ed] back" at them because she was upset that her son was right there during a shooting.

Ms. Barkve said that a "lady" officer requested to speak to J.J. but that she did not want her minor son to speak with police. Ms. Barkve stated that she did not believe the police would be happy to hear what J.J. had to say about the shooting and that she was concerned that J.J. would not be safe if he testified that an officer shot Defendant unprovoked. Ms. Barkve stated that her son is truthful.

*State's Rebuttal*

TPD Officer Tim Brandon testified that he responded to Officer Wilder's call for backup and that, while he was en route, Officer Wilder "got on the radio and said there were shots fired" and that the suspect was "down." Officer Brandon stated that, about forty-five seconds later, he pulled up to the scene. He saw that Officer Pyrdom "had one person on the ground[,]" and he saw Officer Wilder "down on the ground." Officer Brandon did not recall seeing a juvenile on the scene.

On cross examination, Officer Brandon reviewed the dashcam video but denied that he heard anyone say, "He's just a kid." He heard "something that sound[ed] like 'kid.'" After further review of the video, Officer Brandon agreed that he heard someone say, "not my baby" or "something like that."

Agent Williams testified that no one on the scene approached her to tell her that there was a juvenile on the scene. She explained:

> I remember walking toward the trailer that Ms. Barkve described, and I remember her coming up to me screaming, saying excitedly I was not talking to her son. At the moment, I didn't really know why I would need to, other than the fact maybe he was on the general property.

The jury convicted Defendant of the lesser-included offense of attempted second degree murder in count one and of employing a firearm during the commission of or attempt to commit a dangerous felony in count five. The trial court sentenced Defendant as a Range I standard offender to ten years' incarceration with a thirty percent release eligibility in count one and to a consecutive sentence of six years' incarceration with 100 percent release eligibility in count five.

- 17 -

Defendant filed a timely Motion for New Trial which raised, in part, insufficient evidence; improper impeachment of Mr. Larry Woods; and that Defendant was denied a speedy trial. The trial court denied the motion in a written order, and Defendant now timely appeals.

## Analysis

### *Impeachment of Witness Based on Alleged Prior Bad Acts*

Defendant claims the trial court improperly permitted impeachment of defense witness Mr. Larry Woods with prior bad acts of alleged drug dealing. He contends that the court did not substantially comply with the requirements of Tennessee Code Annotated section 24-7-125 and Tennessee Rule of Evidence 404(b) because it made its ruling without hearing any evidence and thus could not have found that the prior bad acts occurred by clear and convincing evidence.

The State responds that the trial court substantially complied with the procedural requirements of Rule 404(b) and properly exercised its discretion in allowing the State to cross-examine Mr. Larry Woods regarding prior bad acts. It contends that the impeachment evidence was properly admitted to show Mr. Larry's Woods's bias against the State. It also asserts that the probative value of the evidence of prior bad acts outweighed its prejudicial effect because the record already showed Defendant was using methamphetamine at the time of the offense.

### Tennessee Rules of Evidence Rule 404(b)

Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

In *State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002), our supreme court held that "a person" for purposes of Rule 404(b) meant only the defendant. In 2014, the General Assembly enacted Tennessee Code Annotated section 24-7-125. The statute and Rule 404(b) were identical, except the for the following italicized language of the statute: "*[i]n a criminal case*, evidence of other crimes, wrongs, or acts is not admissible to prove the character of *any individual, including a deceased victim, the defendant, a witness, or any other third party*, in order to show action in conformity with the character trait." (emphasis added). Since the enactment of section 24-7-125, two opinions of this court have addressed the impact of section 24-7-125 on Rule 404(b). *See State v. Christian Blackwell*, No. W2018-01233-CCA-R3-CD, 2019 WL 2486228, at *6 (Tenn. Crim. App. June 13, 2019) *perm app. denied* (Tenn. June 5, 2020); *State v. Devin Buckingham*, No. W2016-02350-CCA-R3-CD, 2018 WL 4003572, at *14 (Tenn. Crim. App. Aug. 20, 2018) *perm app. denied* (Tenn. Jan. 16, 2019). In both cases, the trial courts' decisions were based on Rule 404(b), and this court reasoned, citing Tennessee Code Annotated section 24-7-125, that even though our supreme court previously determined that Rule 404(b) applied only to the accused, the rules governing Rule 404(b) now applies to "any individual." *Christian Blackwell*, 2019 WL 2486228, at *6; *Devin Buckingham*, 2018 WL 4003572, at *14.

## Standard of Review

Prior 404(b) case law still has precedential value, now applied to any individual in criminal trials and not just defendants. Thus, if a trial court substantially complies with the procedural requirements of section Rule 404(b) when it applies Tennessee Code Annotated section 24-7-125, we will review the trial court's determination for an abuse of discretion. *State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990)). However, if the trial court fails to substantially comply with the requirements of the rule, then the trial court's decision should be afforded no deference by the reviewing court. *DuBose*, 953 S.W.2d at 652.

## Clear and Convincing Evidence

Here, the trial court held a jury-out hearing where it agreed to admit evidence of Mr. Larry Woods's prior bad acts to show the "complete story," and it stated that the probative value of the evidence was not outweighed by unfair prejudice. The court allowed the State

to cross-examine Larry Woods about whether he sold methamphetamine at the location where the shooting occurred. The court did not state on the record at the time of its ruling that it found the prior bad acts were established by clear and convincing evidence. However, the trial court did make that finding the next day, saying, "So just for the record, just to make sure that's clear for the record, I find that by clear and convincing evidence, those incidents did happen." Regardless of its subsequent finding on the day after the 404(b) hearing, the trial court "'had an obligation at the time of the hearing to state on the record whether the prior act was proven by clear and convincing evidence,' and, therefore, there was no substantial compliance" with Rule 404(b). *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012), *as corrected* (Oct. 10, 2012).

Thus, we conclude that the trial court did not substantially comply with the procedural requirements of Rule 404(b), and we review the trial court's decision de novo. *See DuBose*, 953 S.W.2d at 652; *see also State v. Willie J. Cunningham*, No. 02C01-9801-CR-00022, 1999 WL 395415, at *2 (Tenn. Crim. App. June 15, 1999) (finding that a trial court did not substantially comply with the requirements of Rule 404(b) where it failed to make a finding of clear and convincing evidence and where there was a dispute as to whether the prior bad act occurred).

## Rule 404(b) Error

Initially, we note that there is little evidence in the record to support admission of the prior bad acts under Rule 404(b). Officer Wilder testified that he saw a suspicious SUV with "painted windows" whose occupants walked over to the trailer park where Mr. Larry Woods lived. Moreover, Defendant walked out of Mr. Larry Woods's residence with a baggie with methamphetamine residue in his mouth. However, Mr. Larry Woods and Mr. Donald Woods both denied that Mr. Larry Woods sold drugs from his residence, Mr. Larry Woods asserted his Fifth Amendment right against self-incrimination in response to the State's questions, and the State presented no other evidence to establish any prior drug dealing. Mr. Larry Woods's indictments were admitted for identification purposes only and were not evidence. Moreover, while it is true that evidence of prior bad acts is not limited to criminal convictions, "[i]t is a well settled principle that 'indictments are not evidence of the commission of a prior crime.'" *State v. Raymond Griggs*, No. W2005-00198-CCA-R3-CD, 2006 WL 1005176, at *6 (Tenn. Crim. App. Apr. 17, 2006) (quoting *State v. Miller,* 674 S.W.2d 279, 284 (Tenn. 1984)), *perm. app. denied* (Tenn. Aug. 21, 2006); *see e.g., State v. Marvin D. Nance*, No. E2005-01623-CCA-R3-CD, 2007 WL 551317, at *11 (Tenn. Crim. App. Feb. 23, 2007) (stating that an arrest, without more, cannot be used to enhance a sentence). The connection is tenuous between the suspicious SUV witnessed by Officer Wilder and Defendant's possessing a methamphetamine baggie in his mouth with the State's assertion that Mr. Larry Woods was a drug dealer. Thus, the evidence was insufficient to satisfy Rule 404(b)(3).

- 20 -

Even if the State had provided clear and convincing evidence that Mr. Larry Woods was a drug dealer in the past, we cannot see how that information would be relevant to any material issue at trial. Defendant did not dispute that he had methamphetamine in his mouth. Officer Wilder was not present to arrest Defendant on a drug charge but for aggravated assault. That Mr. Larry Woods allegedly sold drugs from his residence in the past does not make it more or less likely that Defendant committed the charged crimes. The evidence of prior bad acts did not "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" because Defendant was not arrested or charged in connection with a drug crime. Tenn. R. Evid. 401. Thus, the evidence did not satisfy Rule 404(b)(2).

Because the evidence was not relevant, its probative value was not outweighed by its prejudicial effect in impeaching an eyewitness called by the defense. Tenn. R. Evid. 403. The admission of the evidence of prior bad acts served only to "prove the character" of Mr. Larry Woods "in order to show action in conformity with the character trait[,]" namely, that Mr. Larry Woods cannot be trusted because he is a drug dealer. Tenn. R. Evid. 404(b). Thus, the evidence does not satisfy Rule 404(b)(4).

### *State v. Gilliland* and "The Complete Story"

Moreover, our supreme court has held that, in terms of Rule 404(b),

> when the [S]tate seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the [S]tate must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the –[S]tate's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

*State v. Bruce Turner*, No. W2010-02513-CCA-R3-CD, 2012 WL 12303681, at *15 (Tenn. Crim. App. May 25, 2012) (quoting *Gilliland*, 22 S.W.3d at 272). "Crimes introduced to tell the 'complete story' will rarely be probative of a fact in issue in the trial of the crime charged and, therefore, rarely justify the prejudice created by their admission." *State v. Darius Alexander Cox*, No. M2017-02178-CCA-R3-CD, 2019 WL 1057381, at *8 (Tenn. Crim. App. Mar. 6, 2019) (quoting Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, *Tennessee Law of Evidence*, § 4.04[13] (6th ed. 2011)). "Crimes admitted to tell the 'complete story' should be only those 'so inextricably connected in time, place, or manner'

- 21 -

that the jury would be baffled by the charged crime without hearing the evidence of the other crime." *Id.*

The trial court allowed the evidence of Mr. Larry Woods's prior bad acts for the "complete story" but made no explicit findings regarding a conceptual void or jury confusion. While evidence of Defendant's use of methamphetamine was relevant to explain why Officer Wilder put his hands on Defendant, it was not relevant where that methamphetamine came from. No void or confusion would have resulted from completely omitting the evidence of Mr. Larry Woods's past arrests. *See Gilliland*, 22 S.W.3d at 272. Thus, we conclude that the trial court erred in allowing the State to question Mr. Larry Woods regarding his alleged prior bad acts under Rule 404(b).

### Bias

The State argues on appeal that Mr. Larry Woods's prior bad acts were admissible under Rule 404(b) because it showed Mr. Larry Woods's "specific bias against the State," which influenced his testimony. Per the State's reasoning, any witness with a criminal record could have their criminal history admitted in a criminal trial, in contravention of the purpose and limits of Rule 404(b) and Tennessee Code Annotated section 24-7-125, because they would have a "specific bias against the State" due to their prior arrests. *See e.g.*, *Vining v. Taylor*, No. CV 08-419 LH/LFG, 2010 WL 11590670, at *3 (D.N.M. Aug. 10, 2010) ("If the [c]ourt were to accept Defendant's argument that criminal history demonstrates a bias against law enforcement officers, then virtually every plaintiff's criminal history would be admissible to prove bias against law enforcement in nearly every claim against the police, in contravention of Rule 403 and 404(b)'s limitations."). We reject this reasoning.

### Harmless Error

The original purpose of Rule 404(b) was to protect a defendant against conviction based on his or her "overall character" or "believed propensity to commit crimes[.]" *State v. Jarman*, 604 S.W.3d 24, 49 (Tenn. 2020). In 2014, the General Assembly extended the protections of Rule 404(b) to witnesses. Tenn. Code Ann. § 24-7-125 (2014). Since a trial witness is not in jeopardy of conviction based on his or her "overall character" or "believed propensity to commit crimes[,]" the effect of the 2014 statute is to protect a trial witness against challenges to the witness's credibility based on character evidence.

While the trial court's admission of Mr. Larry Woods's prior bad acts was error, we nevertheless conclude that the error was harmless. Mr. Larry Woods's testimony was improperly impeached by the admission of prior bad acts; however, Mr. Donald Woods, J.J., and Defendant all testified to virtually the same sequence of events as Mr. Larry

Woods. Mr. Donald Woods and J.J. both testified that they did not see Defendant with a gun in his hand and that Officer Wilder shot Defendant within seconds of removing his hand from Defendant's face or neck. Defendant said that he did not pull a gun on Officer Wilder. Each of the eyewitnesses gave far more information under oath at trial than they did in their statements to police, and the jury was free to conclude their testimonies were suspect. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (stating that the credibility of witnesses are resolved by the fact finder). The jury clearly rejected Defendant's and the eyewitnesses' accounts and accredited Officer Wilder's account that Defendant pointed a gun at Officer Wilder and pulled the trigger. Thus, the error was harmless.

*Sufficiency*

Defendant argues that there was insufficient evidence to support his conviction for attempted second degree murder because the facts, taken in the light most favorable to the State, prove aggravated assault at most. He asserts that there is insufficient evidence to support his conviction for employment of a firearm in the commission or attempt to commit a dangerous felony because there is insufficient evidence to support his conviction for the predicate felony.

The State responds that, taken in the light most favorable to the State, the evidence was sufficient to support Defendant's convictions.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *Bland*, 958 S.W.2d at 659. This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

<u>Attempted Second Degree Murder</u>

As relevant here, second degree murder is "[a] knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1) (2017). Second degree murder is a "result of conduct" offense. *See State v. Brown*, 311 S.W.3d 422, 431-32 (Tenn. 2010); *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2017); *see Brown*, 311 S.W.3d at 431.

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) [i]ntentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (2017). In *Joseph Jackson, Jr. v. State*, this court explained the three subsections of our criminal statute:

Subsection (1) of the criminal attempt statute addresses the classic situation where a pickpocket attempts to steal a wallet. The pickpocket puts his hand in the jacket pocket of a passerby, only to find there is no wallet there. He would still be guilty of criminal attempt. Subsection (2) . . . addresses the situation where one does some act, with the appropriate intent, that would cause an element of the offense to be satisfied without the person doing anything else (i.e., *pulling the trigger on a gun while aiming it at someone*). Finally, subsection (3) is the substantial step subsection, whereby one can be convicted of criminal attempt when he makes a substantial step towards the completion of a crime.

W2006-00606-CCA-R3-HC, 2007 WL 273649, at *3 (Tenn. Crim. App. Jan. 31, 2007) (internal citations omitted) (emphasis added), *no perm. app. filed*.

Taken in the light most favorable to the State, the evidence showed that, when Officer Wilder saw that Defendant had a plastic bag in his mouth, he placed his hand on Defendant's throat and told Defendant to spit out the plastic bag. After Defendant complied with Officer Wilder's command to spit out the bag of methamphetamine, Officer Wilder "push[ed] [Defendant] back down on the steps" with his knee. Defendant became agitated and said, "F---, no. This ain't happening. F---, no." Officer Wilder attempted to "keep [Defendant] pinned," but Defendant pulled a gun he concealed in his waistband and pointed it at Officer Wilder's "ribs" and "stomach." Officer Wilder and Defendant struggled over the gun, and Officer Wilder disengaged the slide so that the gun could not fire. Defendant kept "torqu[e]ing" the gun towards Officer Wilder, and Officer Wilder "could feel the gun pulsing" and "shaking" in Defendant's hand. Officer Wilder believed that meant that Defendant was pulling the trigger.

Defendant argues that there is no evidence that he pulled the trigger, and therefore, Defendant did not commit a "substantial step" as required under subsection (3) of the criminal attempt statute. We disagree. A reasonable juror could conclude that Officer Wilder's description of the gun "pulsing" and "shaking" was the result of Defendant's pulling the trigger, especially in light of Defendant's struggle with Officer Wilder over the weapon and Defendant's statement, "F--- no. This ain't happening." Moreover, as we previously explained in *Joseph Jackson, Jr.*, pointing a gun and pulling the trigger satisfies subsection (2) of the criminal attempt statute because the result Defendant intended would be caused "without further conduct on [his] part." *Joseph Jackson, Jr.*, 2007 WL 273649, at *3*; see* Tenn. Code Ann. § 39-12-101(a)(2) (2017).

We determine that a rational juror could determine that, coupling Defendant's statement, "F---, no. This ain't happening" with his pointing the gun at Officer Wilder and pulling the trigger, Defendant acted with the intent to commit a knowing killing. Further, a rational juror could conclude that, by Defendant's struggling over the gun with Officer Wilder, "torqu[e]ing" the gun at Officer Wilder during the struggle, and pulling the trigger, Defendant "act[ed] with intent to cause the result" of Officer Wilder's death. *See* Tenn. Code Ann. § 39-12-101(a)(2) (2017); *State v. Ricky Lee Womac*, No. E2019-00643-CCA-R3-CD, 2020 WL 4380956, at *5 (Tenn. Crim. App. July 30, 2020) (finding sufficient evidence to support attempted murder where the defendant brandished a gun, the defendant struggled with deputies over control of the weapon, and the defendant pulled the trigger). We conclude the evidence was sufficient to support Defendant's conviction for attempted second degree murder.

- 25 -

<u>Employment of a Firearm During the Commission of or</u>
<u>Attempt to Commit a Dangerous Felony</u>

As relevant here, "[i]t is an offense to employ a firearm during the (1) [c]ommission of a dangerous felony; [or] (2) [a]ttempt to commit a dangerous felony[.]"  Tenn. Code Ann. § 39-17-1324(a) (2017).  Attempted second degree murder is a "dangerous felony" under Tennessee Code Annotated section 39-17-1324(i)(1)(B) (2017).  Employment of a firearm during the commission of or attempt to commit a dangerous felony "is comprised of three separate elements: '(1) that the defendant possessed a firearm; (2) that the possession was with the intent to go armed; and (3) that the first two elements occurred during the commission or attempted commission of a dangerous felony.'" *State v. Duncan*, 505 S.W.3d 480, 485 (Tenn. 2016) (quoting *State v. Fayne*, 451 S.W.3d 362, 369-370 (Tenn. 2014)).  Defendant argues that the third element has not been met because there was insufficient evidence of the predicate felony.

Defendant admitted that he had a firearm, and a rational juror could conclude that he intended to "go armed" because a police officer followed him into the trailer park and he had an outstanding arrest warrant.  Moreover, J.J. testified that, after Officer Wilder pulled up to the trailer, J.J. witnessed Defendant put the gun in his waistband.  As noted previously, there was sufficient evidence to support Defendant's conviction for attempted second degree murder.  Thus, Defendant's argument fails.  There was sufficient evidence to support Defendant's conviction for employment of a firearm during the commission of or attempt to commit a dangerous felony.

*Speedy Trial*

Defendant argues that he was denied the right to a speedy trial because the pretrial delay was greater than one year and was due to bureaucratic indifference.  He contends that he suffered prejudice in the form of pretrial incarceration and pretrial anxiety.

The State responds that the length of delay in Defendant's case was "not egregious," that the delay was "necessary to the fair and effective prosecution of the case," and that Defendant's pretrial anxiety and incarceration did not outweigh the other factors.  We agree with the State.

Both the United States and Tennessee Constitutions guarantee criminal defendants the right to a speedy trial.  U.S. Const. amend. VI; Tenn. Const. Art. I § 9.  The Supreme Court noted in *Barker v. Wingo*,

> [T]he right to speedy trial is a more vague concept than other procedural rights.  It is, for example, impossible to determine with precision when the

right has been denied. We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate. As a consequence, there is no fixed point in the criminal process when the State can put the defendant to the choice of either exercising or waiving the right to a speedy trial. If, for example, the State moves for a 60-day continuance, granting that continuance is not a violation of the right to speedy trial unless the circumstances of the case are such that further delay would endanger the values the right protects. It is impossible to do more than generalize about when those circumstances exist.

407 U.S. 514, 521-22 (1972).

The *Barker* court established a balancing test involving four factors to be considered when determining whether a defendant's right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530. The *Barker v. Wingo* balancing test "necessarily compels courts to approach speedy trial cases on an ad hoc basis." *Id*. The Tennessee Supreme Court "recognized and adopted" the *Barker v. Wingo* balancing test "as the method to determine whether a defendant's right to a speedy trial was violated." *State v. Bishop*, 493 S.W.2d 81, 83-85 (Tenn.1973). Additionally, the Tennessee Supreme Court has stated that the strength of the State's case as to guilt can be used to help judge the four *Barker* factors. *Bishop*, 439 S.W.2d at 85.

"The purpose of the speedy trial guarantee is to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." *State v. Utley*, 956 S.W.2d 489, 492 (Tenn. 1997). The reasons offered to justify delay are assigned different weight in the balancing analysis. *Barker*, 407 U.S. at 531. Possible reasons for the delay are said to fall within four identifiable categories: (1) intentional delay to gain a tactical advantage over the defense or to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. *State v. Wood*, 924 S.W.2d 342, 346-47 (Tenn. 1996). The State's deliberate attempt to delay trial to hamper the defense must be weighed heavily against the State. *Barker*, 407 U.S. at 531. However, "a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.* Finally, *Barker* lists three areas in which a defendant could suffer prejudice due to a delay: (1) oppressive pre-trial incarceration; (2) anxiety and concern of the accused; and (3) impairment of the defense. *Id.* at 532. Of the three, impairment of the defense is the most serious way in which a defendant can be prejudiced. *Id.*

- 27 -

"While such a delay must approach one year to trigger the *Barker v. Wingo* analysis, the line of demarcation depends on the nature of the case. The presumption that pre-trial delay has prejudiced the accused intensifies over time." *State v. Utley*, 956 S.W.2d 489, 494 (Tenn. 1997) (citing *Doggett v. U.S.*, 505 U.S. 647, 652 (1992)).[8] Courts take into account the complexity of the case in evaluating the reasonableness of the length of delay. *Wood*, 924 S.W.2d at 346; *State v. Easterly*, 77 S.W.3d 226, 235 (Tenn. Crim. App. 2001). The delay "that can be tolerated for 'an ordinary street crime' is generally much less than for a serious, complex felony charge." *Easterly*, 77 S.W.3d at 235 (quoting *Barker*, 407 U.S. at 530-31).

## Motion to Dismiss for Violation of the Right to a Speedy Trial

On January 13, 2019, Defendant filed a "Motion to Dismiss for Violation of the Right to a Speedy Trial." The motion was heard on January 23, 2019, and the court took the matter under advisement. Defendant asserts that the trial court erred when it failed to make findings on any of the four speedy trial factors and based its ruling on the fact that the case was "complex." This assertion is not supported by the trial court's February 7, 2019 Order denying Defendant's motion to dismiss in which the court addressed all four of the *Barker* factors. *See Barker*, 407 U.S. at 530.

## Standard of Review

A trial court's determination that a defendant's right to a speedy trial was or was not violated is reviewed under an abuse of discretion standard. *State v. Hudgins*, 188 S.W.3d 663, 667 (Tenn. Crim. App. 2005) (citing *State v. Jefferson*, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996)); *Easterly*, 77 S.W.3d at 236. If the defendant's right to a speedy trial was

---

[8] *Utley*'s "approach one year" language comes from footnote 1 in *Doggett* which states:

Depending on the nature of the charges, the lower courts have generally found post accusation delay "presumptively prejudicial" at least as it approaches one year. *See* 2 W. LaFave & J. Israel, Criminal Procedure § 18.2, p. 405 (1984); Joseph, SPEEDY TRIAL RIGHTS IN APPLICATION, 48 Ford. L. Rev. 611, 623, n. 71 (1980) (citing cases). We note that, as the term is used in this threshold context, "presumptive prejudice" does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry. *Cf.* Uviller, *BARKER V. WINGO*: SPEEDY TRIAL GETS A FAST SHUFFLE, 72 Colum. L. Rev. 1376, 1384-1385 (1972).

505 U.S. at 671, n.1.

violated, the only remedy is to dismiss the charges against him. *Barker*, 407 U.S. at 522; *State v. Bishop*, 493 S.W.2d 81, 83 (Tenn. 1973).

Defendant's arrest warrant was issued December 21, 2017, but he was hospitalized in Alabama at that time. Based on the record before us, Defendant was not incarcerated in Tennessee until January 24, 2018. Defendant's trial began February 11, 2019. Because the timeframe of pretrial incarceration slightly exceeds one year, we will review the balancing factors for a speedy trial violation.

Regarding the length of delay, *Barker* factor (1), Defendant was incarcerated from the time he was incarcerated until trial for one year and eighteen days. At Defendant's arraignment on April 17, 2018, the case was reset to May 9, 2018, so that the State could provide discovery. Defendant claims that, on May 9th, he asked to set a date for trial, but because the prosecutor handling his case was not present, the hearing was reset to May 23, 2018. The court's order, entered on June 18, 2018, stated that the November 28, 2018 trial date was set on May 23, 2018; therefore, Defendant's trial date was set one month and four days after he was arraigned. The short interval between Defendant's arraignment and the setting of Defendant's trial certainly indicates that there was no intentional delay by the State to gain a tactical advantage over the defense or to harass Defendant and that there was no bureaucratic indifference or negligence on the part of the trial court.

On November 6, 2018, the State asked for a continuance of Defendant's trial scheduled to begin November 28, 2018, due to a scheduling conflict with a three-year-old multi-day rape trial scheduled to begin November 29, 2018. The trial court heard the motion to continue the next day, again indicating that there was no bureaucratic indifference on the part of the trial court to Defendant's speedy trial rights. At the November 7, 2018 hearing, both sides agreed that Defendant's case was expected to take several days. The trial court noted the difficulty in finding three days in a row on the docket during the holidays. After a meeting in chambers, it was announced that the case was reset to begin Friday, February 1, 2019. Whether the parties intended to start a multi-day jury trial on a Friday is not clear. As the date approached, the trial court sua sponte moved the trial date to February 11, 2019, because of a scheduled Friday motion docket and so that the trial could continue for three days without a weekend interruption.

We reject Defendant's assertion that a scheduling conflict resulting in a brief delay over the holidays was "bureaucratic indifference" due to an "overcrowded docket." *See Simmons*, 54 S.W.3d at 759. Moreover, Defendant has not shown how the circumstances of his case were such that granting a two-and-one-half month continuance "endanger[ed] the values the right [to a speedy trial] protects." *Barker*, 407 U.S. at 521-22. We conclude, based on the nature of the charges against Defendant and the numerous witnesses involved at trial, the case was sufficiently complex that any delay was not unreasonable, and the

scheduling conflict was a valid reason for delay. *See Barker*, 407 U.S. at 521-22. *Barker* factor (2) weighs against Defendant. *But see State v. Turnbill*, 640 S.W.2d 40, 43 (Tenn. Crim. App. 1982) (stating that, for a thirteen-month delay, a "retirement of the judge who presided over the court to which the case was assigned, the subsequent appointment of his successor, the usual overcrowded docket, and somebody's attendance at an FBI School" were all "either valid or neutral reasons for delay" and "should not be weighed heavily against the State"); *State v. Daniel M. Bailey*, No. 02C01-9612-CR-00456, 1998 WL 70647, at *3 (Tenn. Crim. App. Feb. 23, 1998) (stating that, because "a continuance was necessitated due to scheduling conflicts in the court's trial calendar[,]" the reason for delay was "neutral" and should be "weighed less heavily" against the State).

"[A] delay of thirteen (13) months is not *per se* unreasonable." *State v. Bernard Woodard*, 1993 WL 20123, at *3 (Tenn. Crim. App. Feb. 2, 1993), *perm. app. denied* (Tenn. June 7, 1993). Moreover, Defendant was charged with four felonies ranging from Class A to Class D, and a Class B misdemeanor; therefore, the length of delay was not unreasonable when compared to other cases of the same complexity. *See Easterly*, 77 S.W.3d at 236 (concluding that a twenty-month delay was "not egregious, given the fact that the defendant [wa]s charged with a Class A felony"); *State v. Broderick Joseph Smith*, No. M2009-01427-CCA-R3-CD, 2011 WL 322358, at *6 (Tenn. Crim. App. Jan. 14, 2011) (concluding that a seventeen-month delay was not egregious where the defendant was charged with "six felonies ranging from Class D to Class B"), *perm. app. granted* (Tenn. May 26, 2011). Defendant received his trial with the "customary promptness" of Tennessee courts. *Doggett*, 505 U.S. at 652 (A defendant "cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness."). *Barker* factor (1) weighs against Defendant.

Defendant asserted his right to a speedy trial on March 7, 2018, so *Barker* factor (3) weighs in favor of Defendant. *Simmons*, 54 S.W.3d at 760.

Whether Defendant was prejudiced by the delay is the "final and most important factor," and its purpose is "(1) preventing oppressive pretrial incarceration; (2) minimizing the accused's anxiety and concern; and (3) limiting the possibility of impairment to preparation of the defense." *Easterly,* 77 S.W.3d at 237. Defendant was incarcerated over one year while awaiting trial, and he testified to pretrial anxiety and that he received inadequate medical care at the prison facilities. However, we do not believe Defendant's thirteen-month delay "created undue and oppressive incarceration, maximized his anxiety and concern beyond the normal levels of anxiety and concern that accompany a criminal prosecution, or impaired the ability of [D]efendant to aid in his defense." *See State v. John Wesley Wright*, No. M2011-00436-CCA-R3-CD, 2011 WL 5326282, at *10 (Tenn. Crim. App. Nov. 4, 2011); *see also State v. Alex Biles*, No. C.C.A. 86-104-II, 1987 WL 13446, at *5 (Tenn. Crim. App. July 10, 1987) (finding no "oppressive pretrial incarceration"

where the defendant was incarcerated for fourteen months prior to trial).  Because there is no prejudice, *Barker* factor (4) weighs against Defendant.

After balancing the *Barker* factors, we conclude that Defendant was not denied the right to a speedy trial.  He is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE